Morning, Your Honor, and may it please the Court. My colleague, Mr. Cook, kindly has included in his brief for the government a listing of the purposes of the Arms Export Control Act and the creation of a munitions list by agencies of the United States. The AEC regulates shipments of defense articles in furtherance of world peace, and the munitions list was created so that knowledgeable government agencies could list items as contraband that might contribute to the arms race or aid in mass destruction or support terrorism or increase the escalation of conflict or prejudice by lateral arms control. What we know from the trial before Judge Kacharis is that Brian Bishop grew up in Alabama. Mr. Walutis did not contest our presentation of evidence or offer of proof that he was a recreational shooter or hunter. He had licenses to carry weapons in Alabama. His father testified to his long career with the Foreign Service in many countries overseas where he lived with his family. These were his residences. Mr. Bishop is no longer employed with the Department of State. He had a master's in business administration. He's unlikely to ever work again in the field of financial regulation unless this Court accepts his petition here and vacates his residence. Judge Kacharis on three occasions accepted the government's argument that the information contained in the Foreign Affairs Manual made it, quote, unlawful, unquote, for Mr. Bishop to include ammunition in his household goods. That is a presentation that the government made to Judge Kacharis. This was a bench trial. He accepted that proposal. We suggested that there was nothing in the evidence which actually indicated that what Mr. Bishop did was unlawful for any purpose. Why wouldn't our suit case handle this? As I recall, the defendant had argued in that earlier case that the jury was not instructed that the government had to show that the defendants knew the divisive question was covered by the munitions list or was designed for military use. And our precedent rejected that. And it said whatever specificity on willfulness is required, it is clear that this extremely particularized definition finds no support in the case law. And that's the same claim you're making today. Well, Your Honor, I don't think the Court should decide this case and go against Maybe you think our precedent's wrong. No, no, no. I don't believe the Court should actually decide this case and say that Judge that these weapons were on the munitions list. I indicate to the Court that it could decide it that way. I don't think the Court should and I don't think the Court needs to decide it that way. You said you wanted it to decide it that way. That was the subject of almost your entire reply brief. It was, Your Honor. And alternatively, Your Honor could decide it that way. I think, quite frankly, if you did decide it that way, it would create more work for me. If we look at the Bryan case in the Supreme Court and we take a look at the dissent of Justice Scalia joined by the Chief Judge and Judge Ginsburg, he raises an issue about what law are we talking about when we have a specific intent crime. The government and I How do we get around this? We have not only our own precedent, but how do we get around You've got a 1998 case. The Supreme Court holds that willfulness required proof that the defendant knew his conduct was unlawful, but did not require proof that he was aware of a particular licensing requirement. Your Honor, for purposes of your decision in this case, and actually if you take a look at the record below and the jury instruction that we proposed, the government and I agree that the language in all of these cases, and in Bryan and in Sue, is the proper standard. I suggest to this Court that you can accept both the government's description of the intent element and our description of the intent element. Well, if that's the proper standard, then we're down to a question of fact? Yes, Your Honor, whether this was unlawful conduct. And so you have to take a look Whether he knew it was unlawful. Your Honor, that was the You've raised a question as to whether there was sufficient evidence that he knew his conduct was unlawful. Yes, Your Honor. The government relies entirely on the testimony, principally on the testimony of Ms. Beecroft, who was a longtime civilian employee within the Department of State in the Travel and Transportation Unit. And the government relied upon her testimony that the FAM, the Foreign Affairs Manual, is something that every Foreign Service officer is oriented to. And she said that the FAM tells Foreign Service officers that they can't ship ammunition in their household effects. In Mr. Cook's brief, he elaborates on that and he cites the FAM section, the 611 sections, which were never presented to Judge Kacharis at trial, were never presented as evidence in the case, were never testified to by Ms. Beecroft. And those regulations simply are directives that tell a Foreign Service officer you can't pack ammunition in your household effects because it's the State Department that ships those. If you take a look at FAM 611.6-2, and by the way, the FAM is not even cited as authority in the government's brief, and there's no appendix indicating what those regulations say. But if Mr. Bishop did what the government seems to say he should do, he would look at 611.6-2, which says, quote, the employee should directly ship ammunition separately and consign it to an import handler. So, what Ms. Beecroft said is that- Isn't the weight to be attached to Ms. Beecroft's statement a question for the trier of fact? But Your Honor, it is. In this case, it's a bench trial. It is, Your Honor, but the question is whether what Mr. Bishop did was unlawful pursuant to the warnings that the government relied upon for the evidence that he had the specific intent. And what I would suggest you apply here is what the government and we agree on should be the standard of specific intent in this case. The government must prove that Mr. Bishop acted intentionally to violate a known legal duty. The known legal duty- It wasn't just her testimony. That was part of it, to be sure, but in terms of discerning the intention, the government relied upon the fact that he had failed to list the ammunition on the shipping inventory, so there was evidence of deliberate concealment there. And he also misrepresented, actively misrepresented, that his shipment contained no ammunition or explosives, but rather it was just related to his weight lifting. Your Honor, that is- But, you know, this was before the trier of fact, and he said, well, this is just weights, and it doesn't, you know, there's no ammunition or explosives here, and that just proved to be manifestly incorrect. And when you add that to the different people that told him about the suspicious nature of shipping these weapons and ammunition, including the movers, Paxton, why couldn't a trier of fact, on the find that the government had carried its burden of proving that he knew his conduct was unlawful? Because there are three types of evidence here. One, he was told, or informed by multiple, from multiple sources, Foreign Affairs Manual and the State Department, and the movers themselves of the prohibition, and he didn't list them, and misrepresented what his shipment involved. Your Honor, from the very- As I understand it, on August 3rd, he, this is also part of the record, he admitted to the diplomatic security agent that he knew it was a violation of Embassy Firearms Policy to have ammunition, but personally packed the ammunition and tried to ship it because it was prohibitively expensive. That is exactly the issue that is before this Court. Does the Embassy Firearms Policy, or the directives of the FAM, constitute a notice to him of unlawful conduct? The unlawful conduct here was the violation of the Arms Export Control Act to not have a license to attempt to ship these materials overseas that are listed on a munitions list. Judge Thacker, there is nothing in the Firearms Policy that indicates that that policy makes it unlawful from the standpoint of the Arms Export Control Act. Whether he knew his conduct was unlawful? He had to know that his conduct violated the criminal law. And there is no evidence in the case that his conduct violated the criminal law. And in this Court's case in Shoe, the Court really wasn't concerned about the nature of the instruction because an undercover agent told the defendant that it was unlawful to ship this without a license, that it's on a munitions list, and that you would be criminally prosecuted. The issue is, what is the source of evidence? What is the source of knowledge of the person whose conduct is being controlled here that it's a violation of criminal law for him to put ammunition in his household effects? He knew that what he did was wrong. We told Judge Kacharis before the case went to a bench trial and our motion to dismiss that Mr. Bishop admits that he put out ammunition for the Packers. The facts of this case, as Judge Kacharis found them, was that the Packers knew that he had ammunition. His father testified that he had four gigantic boxes of Cabela's. Isn't this all factual? Isn't this all for the trier of fact? What I'm talking about was found by the trier of fact in favor of Mr. Bishop. Judge Kacharis... No, the ultimate question was whether there was knowledge that the conduct was unlawful. That got to be factual because this is a bench trial, but routinely the question of intent is submitted to a jury or, in the case of the bench trial, to the judge as simply something for the fact finder to resolve. There really isn't much difference here over the legal standard, and at that point it becomes factual and you may say, oh, this is different because there was a judge involved and not a jury, but the question of intent is the quintessential factual determination. I don't disagree with the court one bit. I do not disagree with the court one bit. And my belief is that Judge Kacharis did what he did because the government repeatedly told him that the FAM and these other incidences that you've described, Your Honor, put him on notice that his conduct violates the Arms Export Control Act and kept using the word unlawful. The word unlawful isn't used in any of those directives. And when Mr. Cook gets up here, I would ask Your Honor to ask Mr. Cook, if I may, the Why in It wasn't just the FAM that said it was unlawful. There were other sources, too. There were not. The FAM does not say it's unlawful. The authorization and documents that Mr. Bishop signed, the emails that he was sent, repeatedly said to him the Department of State says you can't put ammunition in your household effects. What about the It's Your Move manual, which talks both about an administrative violation and the fact that unlawfully exporting this type of material is a violation of criminal law. That talks about the shippers. It doesn't say anything about packing ammunition in your Well, as I recall, there was some evidence that all State employees, State Department employees received this manual. I grant you, there's no direct evidence that your client actually received it. But couldn't a prior fact infer that? Judge Kacharis didn't mention that. It was never put in the record. It was never brought out to Judge Kacharis. He never reviewed that particular exhibit. He ruled from the bench after the evidence was presented. And the citation to that, Your Honor, if I may, in the government's brief is much like what the government says to the court. And that is that Mr. Bishop, who was a smart guy, should have gone and looked at the FAM. He should have gone and looked at Section 6.11, whatever it was. And he would see that in the bottom of that, it has a list of the authority for the section. He didn't want to look for it because he knew what he might find. Well, Your Honor, this is the State Department. The State Department is the entity that's responsible for putting items on the munitions list. It's their job. This case requires, and every case requires, that the Secretary of State, in this case, who is— This is not an unsophisticated person. No, Your Honor, I disagree with that entirely. This is an employee of the Department of State. If the Department of State wants to— Why is he going to such lengths to conceal it if he didn't know it was unlawful? Because he knew it was wrong for his employer. He knew that—let me pose this to Your Honor. Mr. Bishop— Isn't that a pretty thin— No, he knew he was violating— Can you tell me that without smiling? He knew it was wrong, but not unlawful? Absolutely. Let me pose this to Your Honor. Mr. Bishop had lived overseas with his family in residence provided for him by the Department of State. He's on duty 24-7, but he and his family live. He could ship a card table. He could ship a crossbow. He could ship a piano. Part of his life is ammunition, all right? Now, he wants to get ammunition over to Jordan. He's used ammunition in Jordan. He's shot in Jordan. The security officer is known to be a recreational shooter. He is shot elsewhere. He wants to get over on the State Department and have them ship his ammunition. I don't think we can write into the statute a recreational shooter exception. I mean, that would just cause all sorts of problems. There actually is, Your Honor. There actually is. The point of fact is there actually is. And in this community— And when he was first—when this first started, his first response was not that the ammunition was for personal use. His first response to the agents was that he was getting it to give to some Jordanian official in the embassy as a gift. So he's shifted his story on the personal use as well. Well, Your Honor, he also said that talk to the general services officer at post. If you talk to the general services officer at post, I talk to him, and he said there would be no problem getting it into the country. And when he was interviewed a year later, and I posed to the court, you know, what's the government doing during the course of a year in trying to decide whether they should prosecute— Well, they were within the statute of limitations, I assume. No, of course it was. I understand. This is a discretionary decision by the Department of Justice. But as Mr. Schott indicated in his testimony, these cases are ordinarily handled by Border Patrol. But the point here is that in every single case, there's evidence that the defendant knew it was a violation of criminal law. Judge Wilkinson, I understand your amusement of this, but let me pose this to you. I think that it's not amusement, it's just the fact that—you must think that Judge Katerish and the appellate court is just really gullible to buy this whole story. Oh, please, Your Honor, this is— No, I mean, this is—how gullible do you think we are? I'm sorry, Your Honor, this is a specific regulatory statute that provides for agencies of the government to periodically change what's on the munitions list. How does one know what's on the munitions list? The point is it all begins to pile up. It's not just one thing, it's one thing and another. It's the manuals, it's the movers, it's the concealment, it's all the misrepresentations about the shipment being involved with waste. It just gets— Let me pose it to you this way. The cumulative effect of it is not favorable, but you've got—I know you're committed to your case, and I really appreciate that, but you've got some rebuttal time ahead of you, okay? Thank you. You've reserved it. We thank you for your sense of conviction about your client, too. All right. Mr. Cook? May it please the Court. I'd like to start by addressing, clarifying a number of points in the record. The It's Your Move document that was admitted into evidence, and it's in the exhibit appendix at 69, specifically, as Judge Diaz was noting, referenced criminal penalties for shipping ammunition. And Ms. Beecroft said in her testimony that orientation is required for all State Department employees and that she always covers that you can't ship ammunition. Although the unlawfulness standard in Bryant and Shue don't require a highly detailed knowledge of the regulatory scheme in order to show that the person understood—had the requisite mens rea that they were committing a violation of the law, there is actually evidence in this case that this defendant had a very sophisticated understanding of this regulatory scheme. And there's a point that I didn't put much weight on in the brief, but in rereading it, I think is very informative, which is this. Ms. Robin Licata, when she was testifying, said that when she spoke to the defendant after discovering the ammunition in the shipment, the defendant asked her if the State Department knew, quote, how much ammunition was there. And that's very significant because, as Chuck Schwingler testified, there is this 1,000-round exception, which is located in 22 CFR 132.17. Schwingler's testimony is Joint Appendix 152 to 154. And so there is, within the Arms Export Control Act and the ITAR regulations, a 1,000-round exemption for ammunition. And the fact that this defendant, when it was first brought to him, we found this ammunition, his reaction is, do they know how much ammunition is there? It shows that this is a guy who actually has a very detailed knowledge of this regulatory scheme. And before Judge Kacheres? Yes, it was. And in fact, clarification, it was Judge Hilton. Oh, I'm sorry. I'm sorry. Yeah, that was the Defense Counsel's point. But the State Department's information was, we won't ship ammunition, period. So the fact that he is worried about the quantity shows that he understood that there was a difference even between what the State Department had been telling him and this regulatory scheme that has this very specific carve-out for 1,000 rounds. But there's also an abundance of evidence through the numerous false statements and deceptive conduct that this defendant took that he understood that his conduct was unlawful. And in cases like Brian, there's nothing like the evidence that this evidence, that this case has showing the defendant understood the regulatory scheme. In Brian, what you had to show the defendant knew that his conduct was unlawful was simply that the crime in Brian was selling a firearm without a federal license. So acting as an arms dealer without a license under 922A1A. And the key evidence there was the defendant used straw purchasers to acquire firearms. He said that he would obliterate serial numbers on firearms. And then he resold firearms on street corners known for drug dealing. There isn't any information, there wasn't any evidence in Brian that the defendant had been instructed about rules governing firearm sales as this defendant had. And yet the Supreme Court said in that case that that conduct was sufficient to establish that the defendant understood, the fact finder could find that that was unlawful conduct. Similarly, in Ratzlaff, which is the case involving money laundering where you've got the most stringent kind of mens rea required, where there is some requirement of a knowledge of the regulatory scheme, the Supreme Court said in a footnote in that case, footnote 19, that a jury may, of course, find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct. Again, even in the context of money laundering, or I'm sorry, structuring, you don't have to have proof that the defendant received specific instruction about the regulatory scheme, but here this defendant, who is, by the way, an employee of the Department of State, which is the agency that administers the Munition Act, and he's going to Amman to further our diplomatic goals. I mean, this is somebody who has, more than your typical person, a reason to understand the rules about exporting firearms and ammunition. Mr. Manning apparently wants us to make a distinction between something being wrong in the abstract, primarily administratively, subject to administrative sanction, and being unlawful, and you seem to be suggesting that there is no distinction. Is there? Well, I think I would agree that at some point the two could come apart. Let's suppose, for example, that this defendant were told by the State Department that your shipment of personal effects can't be over 1,000 pounds. Ammunition is very heavy. We don't want you to include ammunition because it's real heavy and that will put you over. In this case, in fact, there's testimony it was 366 pounds worth of ammunition. I don't think that that, if you had evidence that the defendant thought that what he was doing was just violating a regulation on the amount of weight in a shipment, that that would necessarily establish the unlawfulness of what he was doing. But what we have here is we have a regulation that, as Ms. Beecroft's testimony established, was built off of the Arms Export Control Act, and the regulation in the Foreign Affairs Manual specifically links back to, indeed, the Arms Export Control Act. And given that you don't have to know the details of the regulatory scheme, you don't have to have been specifically directed to 22 U.S.C. 277, the fact that here you had somebody tell him, do not ship ammunition, and tell him that shipping ammunition could be unlawful in the It's Your Move Manual, to insist that you have to have further said that there's the Arms Export Control Act and here's how it works, that would be directly contrary to what Hsu said about, you don't have to know it's on the munitions list. It would be contrary to, in the Supreme Court and Bryan, they overturned 11th Circuit precedent that had required the government, quote, to prove that the defendant acted with knowledge of the licensing requirement. So, Bryan didn't require that level of detail. It's just a knowledge of unlawfulness. Here, where the regulatory scheme is based on the Foreign, the Arms Export Control Act, I think that that's sufficient. But even if you thought that that was, like, you need to be some further showing in this case, I think that the evidence about the defendant asking Ms. Licata about how much ammunition they found shows that he understood that there was even a further difference between what the State Department had told him and the specific regulatory scheme. That question about, that can only be understood, I think, as being aimed at this thousand-round exemption, because the State Department never gave him information about, well, there's a carve-out, you know, we'll give you the ability to ship ammunition in some de minimis amount. What the State Department said is, don't ship ammunition, we're not going to move it for you. Does that address your Honor's concern on that point? One other point I wanted to mention is Defense Counsel has said that the Foreign Affairs Manual was not admitted into evidence, and Ms. Beecroft started talking about the Foreign Affairs Manual, and that's at Joint Appendix pages 125 to 126, and there was an objection from Defense Counsel that, quote, the regulations speak for themselves. In other words, there wasn't testimony from her about the regulations, because it was the understanding that the Court could simply look at the regulations. Unless the Court has any other questions, we'll ask that you affirm the judgment. We don't have any further questions. Your Honor, in listening to Mr. Cook, I may need to modify my suggestion with respect to whether the Court has to look at the First Circuit issue and decide that there has to be proof that he knew it was on the munitions list, because there was ammunition that was not on the munitions list that's perfectly legal to ship, and there was ammunition that was on the munitions list. And if they're relying only on Ms. Beecroft and the FAM, which says you can't put any ammunition into your household effects, then yes, we do need proof that he knew that it was on the particular list. May I just sort of make a practical presentation here to the Court, which I think exemplifies the importance of the argument that we're making, Judge Wilkinson, and I would ask you, all of you, to consider that what Mr. Bishop's concerned about, what I'm concerned about, is the criminalization of an employment-employee relationship. That in this case, where the State Department could easily have disciplined Mr. Bishop for saying, all right, we can test the evidence that what he did was a violation of the Arms Export Control Act. The only evidence that the government presented to the Court was this was a violation of the regulations of the Department of State. And I did review the citation to the manual that was online, and it does talk about shippers and carriers being subject to penalty. It doesn't, it says for shipping hazardous cargo. The point here is that it's actually the State Department that has the risk here. Now, if Mr. Bishop is a Foreign Service officer, and the entire civilian chain of command from Mr. Anteo to Mr. Roque to his supervisor. Nobody's trying to criminalize the employer-employee relationship. All you're saying, all we're saying, I think, is that the facts aren't particularly appealing from your point of view, because someone who is sophisticated and has worked in the State Department for a number of years is in a better position than the person on the street is to know that the conduct is unlawful. That's the simple point. I appreciate your point. So here's what you have to take a look at, Your Honor. In cases where someone has been charged with violating the Arms Export Control Act, and they work in the field, they're in that business, it's part of their job to do this. The courts say that it's your obligation on a regular basis to consult the munitions list. And so when you're working in that field, you can't say, this is void for vagueness, and I wasn't on notice of this. It doesn't go anywhere. If you're not working in that field, if you're a terrorist or you're a gun runner, then there has to be some other source of evidence that you know that this is a violation of the law. And those cases are cases where you've got undercover agents who tell you it's a violation of the law. In this particular case, there's no source of that information. So what you're posing, Judge Wilkinson, is this. All right, Mr. Bishop is part of the Foreign Service, and therefore, he ought to be sophisticated about this, and he ought to appreciate, because he's a Foreign Service officer, that he should go to the FAM, go to the CFR, and realize that it's a violation of the Arms Export Control Act. That point is only one of many. Typically, challenges, and I think this is falling into this trap, challenges to the sufficiency of the evidence pursue a divide and conquer strategy, which is that you take one piece of evidence, in this case, one piece of testimony, and try to pick that apart as if it were the entire case. And what we have to do is we have to consider the total case in context. Of course. And it's not just what he was informed by the mover and a State Department official and the manual and everything, but it's all these misrepresentations and the concealments and everything that leads you to believe he knew exactly what he was doing, and he knew he went to extraordinary lengths to cover it up. No, he covered it up from his employer. The shippers knew that he had ammunition. Judge Hilton, and I apologize to both Judge Kacharis and Judge Hilton, but more cases before Judge Kacharis. They're both five people. They're both five people, and they've both cleaned my clocks on several occasions. But in this case, Your Honor, there's not a single other case out there that the government could possibly rely on for the notion that when Ms. Beecroft says there are DS agents who are in her orientation, law enforcement officers, and she says, well, they're very interested about having weapons and ammunition overseas. I tell them, you can have weapons and ammunition overseas, but you just have to ship them yourself. So clearly, what she says in her orientation does not put anyone on notice that you have to have a license to ship the ammunition. Thank you, Your Honor. Thank you. Thank you very much. We'll adjourn court, and we'll come down and greet counsel.
judges: J. Harvie Wilkinson III, Albert Diaz, Stephanie D. Thacker